FILED
U.S. DISTRICT COURT
AUGUSTA DIV.

2018 MAR 30 AM 11: 45

CLERK
SO. DIST. OF GA.

EVAN DUGAN and ISAAC   *
HUFFAKER,   *
  *
   Plaintiffs,   *
  *
    v.   *    CV 316-050
  *
JONATHAN WRIGHT and IAN   *
LAWSON,   *
  *
   Defendants.   *

_____

**O R D E R**

_____

Before the Court in the captioned matter are motions for summary judgment filed by each of the Defendants. Upon consideration of the record, the parties' briefs, and the relevant law, the motions for summary judgment (doc. nos. 50 and 59) are **GRANTED**.

## I. BACKGROUND

### A. Overview

This case arises out of the arrests of Plaintiffs Evan Dugan and Isaac Huffaker in the early morning hours of August 28, 2014, in Milan, Georgia. At that time, Defendant Jonathan Wright, the sole police officer for the town of Milan, arrested Plaintiffs for criminal trespass and burglary of the

Milan Truck and Tractor Supply Store ("MTT"). (See generally Pls.' Br. in Opp'n to Mot. for Summ. J., Doc. No. 61, Ex. B.)

The Court has been greatly aided by the video taken from Officer Wright's vehicular dashboard camera.[1] (Def. Wright's Mot. for Summ. J., Doc. No. 50, Ex. C.) Officer Wright also wore a microphone on his person that picked up almost all of his conversation while the video camera was recording. Accordingly, while most of the activity cannot be seen on the video, Defendants' actions can be readily discerned through the audio portion, particularly when viewed in conjunction with Officer Wright's Incident Report (Wright Dep., Doc. No. 57, Ex. 8), the deposition testimony of the parties, and the photographs and drawn maps attached as exhibits thereto (Doc. Nos. 55-58.)

While the Court must view evidence in the light most favorable to Plaintiffs, it need not do so when Plaintiffs' version of events is plainly contradicted by the video and audio of the incident. See Scott v. Harris, 550 U.S. 372, 378-81 (2007). Accordingly, the Court will detail the factual background from a chronological description of the video interspersed with deposition testimony and the admitted facts set forth in Defendant Wright's Statement of Undisputed Facts

_____

[1] Significantly, the video was not available to Plaintiffs prior to filing the Amended Complaint on September 14, 2016. (See Am. Compl., Doc. No. 21, ¶ 17.)

("DSUF"), doc. no. 50-1, when necessary for context. For the most part, the facts are not in dispute. Where they are, the Court will address the significance of said "dispute" in the discussion section.

The Court notes that the video begins after Officer Wright's initial encounter with Plaintiffs. The video recording supplied begins as one of the Plaintiffs is seen with his hands resting on the patrol vehicle's hood while Officer Wright sat inside and received information from a dispatcher about Plaintiffs' driver's licenses. The video begins at time mark 0:00 and runs continuously to time mark 1:28:30. At about the 56 minute mark, Plaintiffs were told that they were going to jail. Thus, the length of Officer Wright's investigation into Plaintiffs' conduct that evening was 56 minutes.[2]

## B.  Factual Background

Plaintiffs Dugan and Huffaker were driving around in a Chevrolet Lumina in the late evening hours of August 27, 2014. (DSUF ¶¶ 5-6.)  Plaintiffs entered Milan traveling eastbound on Highway 280.  (Id. ¶ 13.)

As Plaintiffs drove past the MTT, the front of which faces Highway 280, they could hear an alarm sounding.

---

[2]  The Court did not view and need not consider the video past the 57 minute mark.

(Huffaker Dep., Doc. No. 56, at 90.) Plaintiffs turned left onto Main Street, which is past the MTT, and then turned left again onto Lee Street. (DSUF ¶ 15.) The back of the MTT may be accessed by a dirt road leading off of the left side of Lee Street. Before reaching this dirt road, however, there is a peanut warehouse, also on the left side of Lee Street. (See Lawson Dep., Doc. No. 58, Exs. 1 & 3, Huffaker Dep., Doc. No. 56, Exs. 2 & 3.) According to Plaintiffs, Mr. Huffaker recognized that they had turned left off of Main Street too soon, so he instructed Mr. Dugan to turn around. (DSUF ¶ 16; Huffaker Dep. at 79-81.) Mr. Dugan turned left off of Lee Street onto a dirt path near the peanut warehouse, making a U-turn between drying bins that were located under a drying shed. (Huffaker Dep. at 82-83; DSUF ¶ 17.) After making the U-turn and attempting to re-enter Lee Street, Mr. Dugan drove the Lumina into a ditch that paralleled Lee Street, causing the car to become stuck. (DSUF ¶ 18.)

Plaintiffs attempted to get the car out of ditch by pushing from the back and the front. (Huffaker Dep. at 89.) Then they walked to a gas station located nearby on Main Street. Plaintiffs could still hear the alarm. (Id. at 91-92.) They would later tell Officer Wright that they walked to the gas station because they thought it would look suspicious

if they were out in the area of the alarm on Lee Street.[3] (<u>Id.</u> at 146-47.)

At the gas station, Plaintiffs asked a bystander how long the alarm had been going off. The bystander informed them that the alarm had been going off for 15 to 20 minutes. (<u>Id.</u> at 92-93.) Mr. Huffaker used the restroom and bought a drink while Mr. Dugan bought cigarettes. (<u>Id.</u> at 94.) Plaintiffs then walked back to the car to try to dislodge it from the ditch once again. (<u>Id.</u> at 95.) They then decided to return

---

[3] Plaintiff Huffaker also explained his conversation with Officer Wright as follows:

> Huffaker: I remember specifically telling him that I know that this may look suspicious, but I was telling him, "Sir, we were just trying to turn around. We got stuck." . . .

> . . . .

> Q: Why did you think it looked suspicious?

> Huffaker: Well, from the officer's point of view, I mean, if you were right there in close proximity with all that stuff that we had in the vehicle that it just -- a lot of questions would be asked by an officer. I mean, we had an honest answer for every single one of them, but it wasn't good enough for him.

> Q: But you thought when you said those words to him, "Officer, I know this looks suspicious," you could see that there were circumstances that might cause him to wonder what you were doing. Right?

> Huffaker: Yes, sir.

(Huffaker Dep. at 107-08.)

to the gas station to get help. As they were walking back along Lee Street toward Main Street, Officer Wright approached them, activating his flashing lights. (Id. at 95-96; DSUF ¶ 25.) Officer Wright testified that he had been called out at 11:23 p.m. to respond to a burglar alarm at the MTT. (Wright Dep. at 178-79; Def. Wright's Mot. for Summ. J., Ex. B.)

For his part, Officer Wright testified that when he first passed through Lee Street, he observed the Lumina stuck in the ditch at the peanut warehouse.[4] (Wright Dep. at 131 & Ex.8.) He then drove to the MTT and observed that the rear doors had been forcibly pried open so that entry into the building could be made. (Id. at 128, 132.) Officer Wright had routinely patrolled this area and had observed that the MTT rear doors had never had enough play previously for a person to fit through. (Id. at 35-37.) Officer Wright went into the building through the rear doors. He then returned to his patrol car and was driving around when he encountered Plaintiffs.[5] (Id. at 131.)

---

[4] At some point early in the investigation, Officer Wright called the Alabama tag number into the dispatcher. (Wright Dep. at 181.)

[5] The Court recognizes that Officer Wright's deposition testimony initially contradicts this narrative of his conduct in that he testified that he did not get out of his car before he first encountered Plaintiffs. (See Wright Dep. at 30-31.) He also testified that he could not remember whether or not he

According to Officer Wright, Plaintiffs appeared out of breath, rattled, and upset. (<u>Id.</u> at 93.) During their initial encounter, Plaintiffs fully cooperated with Officer Wright, providing their ID cards and explaining that they got stuck in the ditch when they tried to turn around. (<u>Id.</u> at 93 & Ex. 8; Huffaker Dep. at 103-04.) Mr. Dugan presented a California driver's license, and Mr. Huffaker presented a Georgia driver's license indicating an East Dublin address. (Huffaker Dep., Ex. 8.) Also during this initial encounter, Mr. Huffaker revealed that he was legally carrying a firearm, a 40-caliber Beretta, and Mr. Dugan explained that he had a Taser. (Huffaker Dep. at 97-98.) Officer Wright secured the weapons as well as the pocket knife that each Plaintiff had in his pocket. (<u>Id.</u> at 103, 127.) Both Plaintiffs wore boots. (DSUF ¶ 39.)

---

went into the MTT before the time he entered with Deputy Lawson. (<u>See</u> <u>id.</u> at 58-59, 122-24.) However, upon having his recollection refreshed with the Incident Report that he wrote the day of the arrest, he clearly testified that he checked the building before he drove around the area and encountered Plaintiffs. (<u>Id.</u> at 125-26, 131-33.) This version is also supported by the video in that Officer Wright clearly tells Deputy Lawson, who arrived after Plaintiffs had been detained, that he had already been in the building. (Video, at 26:20 mark.) Because the video and the Incident Report are contemporaneous accounts of the incident, the Court credits this version of events, which is not contradicted by any other evidence in the record, over Plaintiffs' hearsay objections. <u>See</u> Fed. R. Evid. 803(5) (listing Recorded Recollection as a hearsay exception); <u>Joassin v. Murphy</u>, 661 F. App'x 558, 559 (11th Cir. 2016) (affirming the district court's refusal to strike an incident report at summary judgment).

The Court will now finish the narrative using the video supplemented by relevant evidence.

*Video, at mark 1:56-2:13*[6]

Officer Wright told Plaintiffs that he is detaining them until he can figure out what is going on. He placed Plaintiffs in the back of his patrol car. (DSUF ¶¶ 48-49.)

*Video, at mark 2:40-3:15*

Officer Wright drove his vehicle down Lee Street to the site of the Lumina in the ditch. During this very short drive, Officer Wright asked Plaintiffs where they had been when he had come by two or three minutes earlier. Mr. Huffaker told Officer Wright that they had gone to the gas station because "the alarm was going off and we didn't want to be back here because we didn't want to look suspicious." (See also DSUF ¶ 51.) Officer Wright responded that it already looked suspicious being back there, to which Mr. Huffaker volunteered that the alarm had been going off for 30 minutes before they even got there.

*Video, at mark 3:15-3:37*

Officer Wright pointed out that Plaintiffs were not "from here" and asked what they were doing "over this way." Mr. Huffaker explained to Officer Wright: "GPS is going this way,

---

[6] The time marks are only approximations, and the quotes from the video are the result of the Court's transcription after viewing the video numerous times.

and I told him we were going the wrong way, and he tried to turn around and he backed up in that, and he got stuck and he tried to go back through there and it just plain got stuck. We tried pushing it out both ways, forward and backwards, and it just won't go out."

*Video, at mark 3:40*

Plaintiffs gave Officer Wright consent to search the Lumina. (DSUF ¶ 52.) Mr. Huffaker informed Officer Wright that there was a lot of military gear. According to Plaintiffs, the Lumina contained all of Mr. Dugan's worldly possessions because he had just arrived in the Dublin area from Alabama two days prior with the intent to live there with Mr. Huffaker.[7] (Huffaker Dep. at 109.) Therein, Officer Wright found a black CRKT knife, a Smith & Wesson knife, Smith & Wesson special ops knife and sheath, machete and sheath, flexi cuffs, cuff cutters, bolt cutters, and a lock picking set. (DSUF ¶ 53.)

*Video, at mark 6:10-6:24*

After Officer Wright had partly searched the vehicle,[8] he

---

[7] Both Plaintiffs recently had been honorably discharged from the United States Army. They had met in the service and had been roommates for a number of years prior to getting out of the service. They had planned to work and live in the Dublin area, where Mr. Huffaker had family. (See generally Huffaker Dep. at 33-37.)

[8] While the search is not on video, the audio contains noises consistent with a search. Indeed, Officer Wright asked for the keys at the 5:12 mark, presumably to access the trunk.

called for assistance to 10-12[9] ("Stand By") until he could "get this thing pieced together."

*Video, at mark 8:31-9:56*

Dispatch informed Officer Wright that the Lumina is registered to Robert Reed from Alabama. Mr. Huffaker again volunteered that his buddy had just purchased it and was in the process of moving to Georgia.

*Video, at mark 10:55-22:45*

Audio consistent with a further search of the Lumina and its contents can be heard, including opening zippers.

*Video, at mark 24:30-26:20*

Defendant Ian Lawson, a Telfair County Sheriff's Deputy, arrived on the scene with his "K-9 companion," Fred, reputed to be a tracking bloodhound. (DSUF ¶ 61.) Deputy Lawson approached the scene from the opposite direction on Lee Street; the front of his vehicle faced the front of Officer Wright's vehicle. According to Deputy Lawson, Fred is a ground disturbance tracker, not an article tracker. (Lawson Dep. at 55.) He had only been tracking a short time with

---

There is no dispute that the vehicle was searched or that Plaintiffs had given consent.

[9] The police code 10-12 means "Stand By." *Police Codes*, zipscanners.com, http://www.zipscanners.com/resources/police-codes (last visited Mar. 8, 2018); accord *Police 10 Codes*, PoliceCodes.org, http://www.policecodes.org/police-10-codes (last accessed on Mar. 8, 2018).

Deputy Lawson. (See generally id. at 24-26.) In fact, this was Fred's first night track with Deputy Lawson. (Id. at 26.)

In the video, Officer Wright told Deputy Lawson that the alarm had been going off and he had "two ex-military nuts" in his car, one from California and the other from Dublin, Georgia and a car from Alabama, one had a pistol and the other a Taser, and they had bolt cutters in a bag. Deputy Lawson could be heard to say "something don't add up at all."

*Video, at mark 26:20-26:40*

Deputy Lawson asked if Officer Wright wants him to "check out the building." Officer Wright responded: "I done checked it - I went through it." He further stated that he had gone around and was coming back to the Lumina to get the car towed when he saw Plaintiffs.

*Video, at mark 26:47-27:22*

Deputy Lawson mentioned his new dog and stated: "He needs to track somebody." Deputy Lawson quipped that they could let Plaintiffs loose to see if he could hunt them. Officer Wright then asked Deputy Lawson if Fred could "track okay" and suggested that Deputy Lawson "see if he runs a track anywhere from [the MTT] to back towards this car." Deputy Lawson agrees. Officer Wright clearly tells Deputy Lawson: "Because I ain't been out on foot other than I walked right straight into the building. I parked at the back door and walked in the

building."

Deputy Lawson drove his patrol car backward down Lee Street and then up the dirt road off of Lee Street to the right side of the MTT. He and Fred began their track. (Lawson Dep. at 39, 53.) Fred reportedly picked up a track about 5 to 10 feet left of the rear door of the MTT and tracked down a dirt path leading to Lee Street.[10] (Id. at 40-42.) Deputy Lawson observed boot prints on this path. (Id. at 56 ("I located a pretty fresh boot print along that path. How fresh it was, I don't exactly know. I know that it was not in any way degraded by environmental conditions.") Once Fred reached the paved Lee Street, his track ended, but the Lumina was visible, a hundred yards away. (Id. at 51.) *Video, at mark 27:50-29:00*

Directly after Deputy Lawson left the scene, Officer Wright made a telephone call inquiring about the owner of the MTT. During this conversation, Officer Wright remarked as follows: "There's entry been made into the [MTT]. And I mean, one of these cats got a gun on him and one of 'ems got a Taser. And, they ain't from nowhere around here. And the car's conveniently stuck back here within walking distance of the place. So it ain't looking too good for them. Looking

---

[10] This dirt *path* is not the same as the dirt *road* that Deputy Lawson drove down to access the MTT. Rather, it was on the opposite side of the MTT and closer to the peanut warehouse. (See Lawson Dep., Exs. 1 & 3.)

like the alarm scared them off . . . ."

*Video, at mark 33:07*

Officer Wright called someone to come and get the Lumina.

*Video, at mark 33:45*

Walking on Lee Street toward the front of the patrol car, Deputy Lawson returned to Officer Wright on foot and with Fred on leash. Deputy Lawson told him he had boot prints and asked if Plaintiffs were wearing boots. Deputy Lawson and Officer Wright walked back down Lee Street toward the MTT together. Officer Wright remarked: "I'm pretty sure [Plaintiffs were] going to be 10-95 to the jail anyway.[11] Because it just ain't adding up. The whole situation ain't adding up."

*Video, at mark 35:05*

Deputy Lawson explained that there is a "little dirt path" and that he had "marked one of them (presumably boot prints) with my boot."[12] He claimed that Fred "hit right on 'em."

*Video, at mark 35:30*

Deputy Lawson could be heard showing Officer Wright something, indicating "that's me . . . this ain't."

---

[11] The police code 10-95 means "Subject in custody." <u>See</u> note 9, <u>supra</u>.

[12] Photographs of the investigation include multiple shots of boot prints; one photograph shows two different boot prints side by side, presumably one is Deputy Lawson's. (Lawson Dep., Ex. 4, at JW000081.)

13

*Video, at mark 35:41-36:44*

Officer Wright shouted an expletive and he hurried back to his patrol car, shining his flash light into the front windshield of the patrol car as he approached. When he got to the car, he asked Plaintiffs, "Was that you?", referring to what he described as a "loud clank." Plaintiffs responded no.

*Video, at mark 36:40-38:20*

Mr. Huffaker asked Officer Wright for an explanation of what was going on. Officer Wright mentioned the alarm and that there had been forced entry. Mr. Huffaker complained that Officer Wright had searched their person and the car and that they did not have anything. Once again, Mr. Huffaker volunteered that he knew it looked kind of suspicious being there. Plaintiffs denied that they went up toward the MTT. Officer Wright asked Plaintiffs about the tools he found in the Lumina such as the bolt cutters. Plaintiffs explained that it was all from the Army. When Officer Wright challenged Plaintiffs that the Army would have kept those items, Plaintiffs explained that they had purchased the items to practice breaking open doors and clearing rooms because they had been in the infantry.

*Video, at mark 38:19-38:49*

As this conversation took place, Deputy Lawson and Fred came back on foot to join Plaintiffs and Officer Wright at the patrol car. Deputy Lawson again mentioned that Fred had "come

14

through" to "right here." Deputy Lawson said he was going to put up Fred, and he walked back to his patrol car which was still parked to the right side of the MTT. Officer Wright stated that he was putting Plaintiffs' belongings back in the Lumina.

*Video, at mark 39:36-40:26*

Officer Wright got back into his patrol car and drove to the MTT and also parked on the right side. Deputy Lawson's patrol vehicle was now in sight.

*Video, at mark 40:28-41:00*

Officer Wright arrived at the MTT in his patrol car at the same time that Deputy Lawson arrived on foot. Deputy Lawson asked Officer Wright to tell dispatch that he had "logged one successful track; back at the unit." Deputy Lawson then put Fred in his patrol car. Officer Wright told Plaintiffs to "bear with me" while he looked around.

*Video, at mark 41:39-42:20*

Deputy Lawson asked Officer Wright if he had seen the back door, and Officer Wright reconfirmed that he had already been in the building. Officer Wright explained that he had not had a chance to look around there "for footprints and whatnot." Deputy Lawson reconfirmed that he had showed Officer Wright some footprints "back on the path."

*Video, at mark 42:50-44:43*

15

Officer Wright and Deputy Lawson went out of sight of the video to the patrol car's left and toward the MTT. Their conversation could be clearly heard however. Deputy Lawson explained where he and Fred picked up their track. They then discussed the rear door, making remarks such as "it was plumb pried loose, broken loose" and "they just forced this thing off of there."

*Video, at mark 44:45-47:16*

Having entered the bay area of the building,[13] the officers discussed boot prints. They observed one print that "looks like one of the tracks out in the dirt." One officer held a light while the other took pictures. They also discuss the interior door, which was still locked. The officers could be heard theorizing that Plaintiffs must have triggered the alarm by tampering with the interior door.[14] They also theorized that some of the boot prints were so good because Plaintiffs had been running.

*Video, at mark 48:29-52:24*

Officer Wright and Deputy Lawson left the building and

---

[13] The audio inside the building's bay area is distinctly different than it is when the officers are outside of the building.

[14] Apparently, the alarm system was tied into the interior door as opposed to the rear doors. On the other side of the interior door were guns and ammunition because the MTT sold firearms as well as tractor supplies. One officer remarked that they were "trying to get into the guns."

then could be heard observing several boot prints along the dirt path, presumably the one that Deputy Lawson and Fred had walked earlier. They surmised again that the boot print impressions show that the person had been running. The officers retraced the path and took more pictures.

*Video, at mark 55:37*

The officers returned to their patrol cars. Deputy Lawson left the scene, and Officer Wright got into his vehicle.

*Video, at mark 55:50*

Officer Wright began pulling away from the MTT. Mr. Huffaker asked Officer Wright if he was going to arrange for a tow truck for them, to which Officer Wright informed them that they would be going to jail. He further remarked: "Cuz that dog run a track right straight back to your car from the building and there's footprints out here all in the dirt walking right straight back to your car."

Officer Wright took Plaintiffs to the Telfair County Jail. (Wright Dep. at 122.) On August 29, 2014, the magistrate judge issued arrest warrants against Plaintiffs for criminal trespass and burglary. (Id. at 155.) On December 8, 2014, the charges were dismissed. (Huffaker Dep. at 132.)

## C. Procedural Background

On March 30, 2016, Plaintiffs filed suit in the Superior Court of Telfair County, Georgia, alleging both state and federal claims against Officer Wright and a John Doe defendant. Officer Wright removed the case to this Court on June 22, 2016. On September 14, 2016, Plaintiffs filed an Amended Complaint, naming Deputy Lawson as a party defendant.

The Amended Complaint is the operative complaint in the case. Therein, Plaintiffs claim that Defendants illegally detained and falsely arrested them in violation of their Fourth Amendment rights under the United States Constitution. (Doc. No. 21, Count I.) Plaintiffs also claim they were falsely imprisoned in violation of the Fourth and Fifth Amendments. (Id., Count II.) Plaintiffs also assert the denial of rights under the Georgia Constitution as well as state law claims for false arrest, false imprisonment, and intentional infliction of emotional distress. (Id., Counts III-VI.)

Defendants have filed motions for summary judgment on all of Plaintiffs' claims. The Clerk gave the nonmoving parties, the Plaintiffs, notice of the summary judgment motions and the summary judgment rules, of the right to file affidavits or other materials in opposition, and of the consequences of default. (Doc. Nos. 54 and 60.) Therefore, the notice requirements of Griffith v. Wainwright, 772 F.2d 822, 825

18

(11th Cir. 1985) (per curiam), are satisfied. The time for filing materials in opposition has expired, and the motions are ripe for consideration.

## II. SUMMARY JUDGMENT STANDARD

The Court should grant summary judgment only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The purpose of the summary judgment rule is to dispose of unsupported claims or defenses which, as a matter of law, raise no genuine issues of material fact suitable for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

In considering a motion for summary judgment, all facts and reasonable inferences are to be construed in favor of the nonmoving party. Hogan v. Allstate Ins. Co., 361 F.3d 621, 625 (11th Cir. 2004). Moreover,

> [t]he mere existence of some factual dispute will not defeat summary judgment unless the factual dispute is *material* to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

Chapman v. AI Transp., 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoted source omitted) (emphasis supplied). The party opposing the summary judgment motion, however, "may not rest upon the mere allegations or denials in its pleadings.

Rather, its responses . . . must set forth specific facts showing that there is a genuine issue to be tried." Walker v. Darby, 911 F.2d 1573, 1576-77 (11th Cir. 1990).

### III. DISCUSSION

In this case, Defendants assert that they are entitled to qualified immunity for Plaintiffs' federal claims of false detention and arrest and false imprisonment.

Qualified immunity is a judicially-created affirmative defense under which "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). "To receive qualified immunity, the public official must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." Lumley v. City of Dade City, 327 F.3d 1186, 94 (11th Cir. 2003) (citations omitted). Here, it is clear that Defendants were acting in their discretionary capacities when they engaged in the conduct presently challenged by Plaintiffs, a point which Plaintiffs do not contest. Accordingly, the burden shifts to Plaintiffs to demonstrate that qualified immunity is not appropriate. See id.

"In resolving questions of qualified immunity at summary judgment, courts engage in a two-pronged inquiry." <u>Tolan v. Cotton</u>, 134 S. Ct. 1861, 1865 (2014). "The first [prong] asks whether the facts, taken in the light most favorable to the party asserting the injury, show the officer's conduct violated a federal right." <u>Id.</u> (quoting <u>Saucier v. Katz</u>, 533 U.S. 194, 201 (2001) (alterations omitted)). "The second prong of the qualified-immunity analysis asks whether the right in question was 'clearly established' at the time of the violation." <u>Id.</u> at 1866 (citing <u>Hope v. Pelzer</u>, 536 U.S. 730, 739 (2002)). "Courts have discretion to decide the order in which to engage these two prongs . . . [b]ut under either prong, courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." <u>Id.</u> (citations omitted). Because the Court has determined that Plaintiffs' cannot establish a constitutional violation as a matter of law, the Court need not address the clearly established prong.

The Fourth Amendment to the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." A "seizure" occurs "when there is a governmental termination of freedom of movement through means intentionally applied." <u>Brower v. Cnty. of Inyo</u>, 489 U.S. 593, 596-97 (1989).

Generally, a seizure is reasonable if it is supported by

probable cause. Croom v. Balkwill, 645 F.3d 1240, 1246 (11th Cir. 2011) ("Traditionally, seizures by law enforcement have been reasonable under the Fourth Amendment only if justified by probable cause to believe that the detainee committed a crime."). In fact, an arrest made with probable cause is "an absolute bar to a subsequent constitutional challenge to the arrest." Gates v. Khokhar, --- F.3d ---, 2018 WL 1277395, *4 (11th Cir. Mar. 13, 2018) (quoted source omitted).

"Probable cause to arrest exists if the facts and circumstances within the officer's knowledge, of which he has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed or is committing an offense." Ortega v. Christian, 85 F.3d 1521, 1525 (11th Cir. 1996) (citation omitted); United States v. Floyd, 281 F.3d 1346, 1348 (11th Cir. 2002) (stating that probable cause to arrest exists when a law enforcement official has "facts and circumstances within [his] knowledge sufficient to warrant a reasonable belief that the suspect had committed or was committing a crime" (quotation marks omitted)). Probable cause requires only "a probability or substantial chance of criminal activity, not an actual showing of such activity." Illinois v. Gates, 462 U.S. 213, 243 n.13 (1983). Probable cause determinations are guided by reviewing the totality of the circumstances. Id. at 233.

In the context of a qualified immunity defense, all that is required of an arresting officer is "arguable probable cause to believe that a person is committing a particular public offense; that is, where reasonable officers in the same circumstances and possessing the same knowledge as the Defendants could have believed that probable cause existed to arrest the plaintiffs." Scarbrough v. Myles, 245 F.3d 1299, 1302 (11th Cir. 2001) (quoted sources omitted); Jones v. Cannon, 174 F.3d 1271, 1283 n.3 (11th Cir. 1999) ("Arguable probable cause, not the higher standard of actual probable cause, governs the qualified immunity inquiry."). This standard recognizes that a law enforcement official may make a reasonable but mistaken judgment regarding probable cause.

In the case at bar, Defendants are entitled to qualified immunity on Plaintiffs' claims of false arrest and false imprisonment if their arrests are supported by arguable probable cause. Thus, this Court must determine whether a reasonable officer in the same circumstances and possessing the same knowledge as Defendants could have believed that probable cause existed to arrest Plaintiffs for criminal trespass and burglary.[15]

---

[15] Deputy Lawson's motion for summary judgment is premised in part upon his contention that he did not make the decision to arrest Plaintiffs, rather it was the decision of and within the sole discretion of Officer Wright. Because this Court concludes that arguable probable cause exists to support Plaintiffs' arrest, the Court need not differentiate between the responsibilities of Defendants.

In Georgia, a person commits the offense of burglary in the second degree "when, without authority and with the intent to commit a felony or theft therein, he or she enters or remains within an occupied, unoccupied, or vacant building [or] structure . . . ." O.C.G.A. § 16-7-1(c). A person commits a criminal trespass "when he or she intentionally damages any property of another without consent of that other person and the damage thereto is $500.00 or less . . .," O.C.G.A. § 16-7-21(a), or "when he or she knowingly and without authority [e]nters upon the land or premises of another person . . . for an unlawful purpose," O.C.G.A. § 16-7-21(b)(1).

In the case at bar, Defendants knew the following undisputed[16] facts on the evening of April 27. Officer Wright was called to the area when the alarm system at the MTT had been triggered. When he arrived shortly thereafter, he spotted a car stuck in the ditch of Lee Street, from which the back of the MTT can be accessed by a dirt road. He investigated the MTT and noticed that the rear door looked as

---

[16] The Court derived most of these undisputed facts from the uncontradicted video of the investigation. The other undisputed facts are from Officer Wright's testimony and are supported by statements he contemporaneously made in the video or in his Incident Report. Other than point to minor inconsistencies in Officer Wright's deposition testimony given two and a half years later, Plaintiffs have set forth no evidence to create a genuine dispute of these facts.

24

though it had been pried loose. He then got back into his patrol car and located Plaintiffs on Lee Street, walking away from their car in the ditch and the MTT. Both Plaintiffs had weapons on their person and wore boots. Shortly thereafter, Officer Wright discovered items consistent with burglary tools such as bolt cutters, gloves, and a lock picking set in Plaintiffs' vehicle. Plaintiffs were not residents of the area, and the car they were driving was registered to a third person in Alabama. Of note, Officer Wright was already forming the opinion that Plaintiffs had gained access to the MTT with the intent to steal at the time Deputy Lawson arrived. Deputy Lawson and Fred then ran a successful track from the left rear of the MTT down a dirt path to Lee Street, indicating that the ground had recently been disturbed on that path. Deputy Lawson also found boot prints along that path and later showed them to Officer Wright. When Officer Wright re-entered the MTT with Deputy Lawson, they found more boot prints leading up to and around the interior office door, which was still locked. The boot prints seemed to match the ones along the dirt path and appeared to be left by somebody running. At this point, Defendants determined that probable cause existed to arrest Plaintiffs for criminal trespass and burglary. Taking into account the statutory elements of these crimes and the undisputed facts known to Defendants, the Court

readily concludes that an objectively reasonable officer at the scene could have believed that probable cause existed to arrest Plaintiffs.

Plaintiffs' response to these undisputed facts is twofold. Plaintiffs either contend that Defendants should have done more in their investigation or they attack the credibility of Officer Wright, and to some extent Deputy Lawson, by pointing out inconsistencies in their deposition testimony.

First, Plaintiffs complain that Defendants did not reach the owner of the MTT, therefore, they did not determine the condition of the rear door prior to that evening or find out whether anything had actually been stolen from the MTT.[17] They further complain that Defendants never looked at their boots to compare them to the tracks that they found prior to their

---

[17] Plaintiffs state: "If the owner had confirmed there was nothing stolen from the business, [Defendant] Wright would not have charged Plaintiffs with burglary." (Pls.' Br. in Opp'n to Wright's Mot. for Summ. J., Doc. No. 61, at 8 (citing Wright Dep. at 105).) The hypothetical presented to Officer Wright at deposition is irrelevant, however, because it is undisputed that Officer Wright did not know that *nothing* was stolen either. Besides, this fact would not have prevented Officer Wright from charging attempted burglary or criminal trespass.

With respect to the condition of the door, Officer Wright testified that he was familiar with the rear entry from his prior patrols of the area.

arrest.[18] Plaintiffs also complain that Defendants did not
seek out other potential witnesses (e.g., at the gas station)
to confirm how long the alarm had been going off or contact
the owner to find out whether it was simply a false alarm.
Police officers, however, are not tasked with ruling out or
chasing down every eventuality or rationalization offered by
detained suspects. Kingland v. City of Miami, 382 F.3d 1220,
1229 & n.10 (11th Cir. 2004) (An officer "'is not required to
explore and eliminate every theoretically plausible claim of
innocence before making an arrest.'" (quoted source omitted));
Williams v. City of Homestead, Fla., 206 F. App'x 886, 888-89
(11th Cir. 2006) ("[W]hile a police officer should consider a
suspect's explanation in evaluating the existence of probable
cause, he 'is under no obligation to give any credence to a
suspect's story nor should a plausible explanation in any
sense require the officer to forego arrest pending further
investigation if the facts as initially discovered provide

---

[18] There is a dispute about whether Officer Wright looked
at Plaintiffs' boots at the scene, and the Court could not
locate a time in which he asked to do so. Nevertheless, the
fact remains that Plaintiffs wore boots and fresh boot prints
were found in the building that matched ones on a dirt path
running away from the building and toward Plaintiffs' car.
The fact that Officer Wright did not attempt to confirm an
exact match at the scene of the crime does not negate probable
cause. Besides, Officer Wright further testified that he took
photographs of the boot prints at the scene and of Plaintiffs'
boots at the jail when they were removed. (Wright Dep. at
69.)

probable cause.'" (quoted source omitted)).

Second, Plaintiffs' claim that Defendants "falsified" the facts is unavailing in light of the uncontradicted video and audio evidence. For instance, Plaintiffs point out that Officer Wright "changed his story" about when he determined that entry was made into the rear door because at deposition he stated that he first determined that the door had too much play in it when he entered with Deputy Lawson but later stated that he made this determination upon his initial entry. Plaintiffs make much of Officer Wright's statement to Deputy Lawson as they approached the rear door together that he was "still trying to figure out exactly how they got in [the building.]" As the Court has already pointed out, <u>see</u> note 3 <u>supra</u>, in his deposition testimony two and a half years later, Officer Wright was initially confused about whether he made an initial entry prior to Deputy Lawson's arrival, but his recollection was refreshed with his Incident Report. In any event, there is no dispute that the officers believed that entry was made in the rear door, which was "pried loose or broken loose." Plaintiffs attempt to create a dispute of fact by stating that Mr. Huffaker could see the rear door from the back of the patrol car and noticed that the door appeared closed and had not been forced open. Nevertheless, the officers were able to simply bend the door to allow each other

28

to walk in. Thus, the appearance of the door to Mr. Huffaker from his vantage point prior to the officers gaining entry during their investigation is irrelevant. It certainly does not impugn the veracity of the officers' investigation and the theory that someone had entered the MTT through the rear door.

Plaintiffs also point to Deputy Lawson's testimony at deposition that if he had known that Officer Wright had walked all around the building and the dirt path that evening, he would not have employed Fred to run a track. Thus, Officer Wright should not have relied on the track. The hypothetical presented to Deputy Lawson at deposition, however, is not based on actual fact. The undisputed facts from the video are that Officer Wright informed Deputy Lawson prior to running the track that he had pulled up to the rear door of the MTT and only walked into and out of the building. Thus, Officer Wright did not contaminate the left side of the MTT where Fred picked up the track or the tracked dirt path on which they observed boot prints. Plaintiffs' representation to this Court that Officer Wright had "walked the property" or "walked the very path that the K-9 later allegedly tracked"[19] is disingenuous.

---

[19] Officer Wright actually testified that he walked the dirt path "at some point." (Wright Dep. at 81.)

Plaintiffs set forth other minor arguments such as the fact that while they had so-called burglary tools in their Lumina, there was no evidence that Plaintiffs used any of the tools to enter the MTT and the fact that Fred was inexperienced. Plaintiffs' beleaguered attempt to have this Court view and analyze each piece of evidence in hindsight and in isolation, i.e., not in conjunction with the whole of the investigation that occurred on the evening of the arrest, is erroneous. See United States v. Allison, 953 F.2d 1346, 1349-51 (11th Cir. 1992) (emphasizing that probable cause factors must be considered together, as a whole, rather than analyzed separately for whether an innocent explanation for each factor exists). Plaintiffs' red herrings do nothing to disabuse this Court of its conclusion that their arrests were wholly supported by undisputed facts that reasonably and objectively lead to a finding of arguable probable cause. In other words, any reasonable officer knowing the facts that Defendants knew could have believed that probable cause existed to arrest Plaintiffs.

Plaintiffs contend that they were simply in the wrong place at the wrong time. Yet, qualified immunity protects officers who mistakenly arrest the innocent man in the wrong place at the wrong time. See Hunter v. Bryant, 502 U.S. 224, 227 (1991) ("Even law enforcement officials who reasonably but

mistakenly conclude that probable cause is present are entitled to immunity."); Gates, --- F.3d ---, 2018 WL 1277395, at *4 ("[T]he Constitution does not guarantee that only the guilty will be arrested." (quoting Baker v. McCollan, 443 U.S. 137, 145 (1979)). Remarkably, even Plaintiff Huffaker contemporaneously conceded twice that the circumstances in which Plaintiffs found themselves that evening would appear "suspicious" to any police officer who came upon it. This Court agrees. It was entirely reasonable, reasonable as a matter of law, for Defendants to conclude that Plaintiffs' suspicious activity rose to the level of probable cause to arrest. Thus, Defendants are entitled to qualified immunity for Plaintiffs' federal constitutional claims.[20]

## IV. CONCLUSION

Upon the foregoing, Defendants' respective motions for summary judgment (doc. nos. 50 and 59) are **GRANTED** with respect to all of Plaintiffs' federal claims.[21] The Court declines to exercise jurisdiction over Plaintiffs' state law

---

[20] Because Plaintiffs' arrest was constitutional, they cannot state a claim for false imprisonment.

[21] Because the Court determined that oral argument would not aid the resolution of the instant motions, the motions for oral argument (doc. nos. 53 and 68) are **DENIED AS MOOT**.

claims[22]; thus, they are **DISMISSED WITHOUT PREJUDICE**. The Clerk is directed to **ENTER JUDGMENT** in favor of Defendants and **CLOSE** this case. Costs are taxed against Plaintiffs.

**ORDER ENTERED** at Augusta, Georgia, this 30th day of March, 2018.

UNITED STATES DISTRICT JUDGE

---

[22] Pursuant to 28 U.S.C. § 1367(c), a district court may decline to exercise supplemental jurisdiction over state law claims if it has dismissed all claims under which it has original jurisdiction.